

FILED
Apr 28 2023, 9:25 am
CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

William W. Gooden
Mt. Vernon, Indiana

ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Attorney General of Indiana

Courtney Staton
Deputy Attorney General
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Peggy Sue Higginson,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff.* | April 28, 2023<br><br>Court of Appeals Case No.<br>22A-CR-2634<br><br>Appeal from the Posey Circuit Court<br><br>The Honorable Craig S. Goedde, Judge<br><br>Trial Court Cause No.<br>65C01-1806-MR-293 |

**Opinion by Judge Riley.**
Chief Judge Altice and Judge Pyle concur.

**Riley, Judge.**

## STATEMENT OF THE CASE

[1] Appellant-Defendant, Peggy Sue Higginson (Higginson), appeals her sentence after pleading guilty to voluntary manslaughter, a Level 2 felony, Ind. Code § 35-42-1-3.

[2] We affirm.

## ISSUES

[3] Higginson presents a single issue on appeal, which we restate as the following two issues:

(1) Whether the trial court abused its discretion at sentencing; and

(2) Whether her sentence is appropriate in light of the nature of the offense and her character.

## FACTS AND PROCEDURAL HISTORY

[4] Higginson and Troy Higginson (Troy) got married in May 2011. On October 23, 2013, Troy called 911, claiming that Higginson "had gone crazy and attacked him with a whiskey bottle and that he was bleeding." (Appellant's App. Conf. Vol. II, p. 77) (internal quotation marks omitted). The State charged Higginson with Class A misdemeanor domestic battery the next day. As part of a pretrial diversion agreement, Higginson agreed to attend anger management and all recommended services, which she successfully completed. Accordingly, on April 28, 2014, the charge against Higginson was dismissed.

On March 13, 2018, at about 4:09 p.m., Posey County Sheriff's Department (PCSD) was dispatched to the Higginson's residence at 1000 Wade Road, Wadesville, Indiana. Troy, who had called 911, reported that Higginson had "lost it" and torn "everything up in the residence." (Appellant's App. Conf. Vol. II, p. 101). Troy claimed that Higginson had a history of violence. (Appellant's App. Conf. Vol. II, p. 101). At approximately 4:11 p.m., an officer from Mount Vernon Police Department arrived at the residence and detained Higginson. PCSD arrived shortly thereafter. Troy informed PCSD that he was afraid Higginson would attack him and that she was "unstable and he was not sure what she might do[.]" (Appellant's App. Conf. Vol. II, p. 101). PCSD advised Troy to go somewhere else for the night and to file a protective order the next day. PCSD also informed Troy that there was nothing they could do since he and Higginson were married and that either one of them could destroy anything in the house and face no criminal repercussions. Before the officers left, Higginson assured them that she would stay in a separate bedroom from Troy that evening and that there would be no further issues. Both were advised to call 911 if things got out of hand. The next day, on March 14, 2018, Troy petitioned for an order of protection and a request for a hearing in which Troy claimed that he had been a victim of domestic violence. Troy claimed that Higginson had destroyed their house on November 23, 2014, and March 13, 2018, and had hit him in the face with a liquor bottle in October 2013. The trial court issued an *ex parte* order for protection on the same day. The *ex parte* order expired, and neither Troy nor Higginson appeared for the hearing set by the court.

[6] Troy filed for divorce on April 30, 2018,[1] and the final dissolution hearing was scheduled for June 29, 2018. In that petition, Troy claimed that he had been living separately from Higginson since April 28, 2016. Shortly after filing for divorce, Troy filed another petition for an order of protection and a request for a hearing, offering the same examples of abuse he offered in his prior petition. Due to the parties' impending divorce, Troy's petition for an order of protection was denied on May 2, 2018.

[7] About a month later, on June 20, 2018, at around 10:24 p.m., Indiana State Trooper Zack Fulton (Trooper Fulton) and Deputy Jacob Melliff (Deputy Melliff) of the PCSD were dispatched to the Higginson's marital home due to another domestic violence complaint. Higginson was identified as the "aggressor in the altercation." (Appellant's App. Vol. II, p. 132). When asked what had happened, Troy reported that Higginson had wanted to leave in his expensive vehicle. When he refused, he offered to give her a ride to her stepdaughter's house in Evansville, which led to a verbal argument. Troy denied hitting Higginson. Higginson reported that there was no physical altercation, but Troy had attempted to take the vehicle keys out of her hands. Deputy Melliff observed no injuries on Higginson's exposed arms and hands, and to avoid further issues in the night, Deputy Melliff offered Higginson a ride to her stepdaughter's house in Evansville. Later that evening, Higginson posted

---

[1] The record shows that in July 2015, Troy filed for divorce, but the trial court dismissed the matter in March 2016 "due to lack of prosecution pursuant to Trial Rule 41(E)." (Appellant's App. Vol. II, p. 163).

pictures of bruises on her arms and hands on Facebook alleging that Troy had physically hurt her that night.

[8] The next day, on June 21, 2018, Higginson's stepdaughter dropped Higginson at Troy's home. According to Higginson, she was there to do laundry. When Troy arrived later that day, the two began arguing. Troy eventually locked himself in the main bedroom while Higginson locked herself in a second bedroom, and they communicated via text. Higginson issued provocative statements, which included that she had been sleeping with other men during their marriage and that she was searching for new partners such as "young fuck buddies." (Exh. Vol. II, p. 70). Troy requested that Higginson leave the premises peacefully and "not to make this ugly." (Exh. Vol. II, p. 66). Higginson responded by referencing Troy's statement of wanting to reconcile and asking her to stay the previous night while Deputy Melliff and Trooper Fulton were present. Although Higginson finally agreed to leave Troy's home, she demanded to leave on Troy's motorcycle and asked for the keys. Troy refused per his attorney's instructions and stated that he would give her the keys after their divorce finalized in the coming week. Troy, instead, offered to drive Higginson to her stepdaughter's house in Evansville. When the two got inside Troy's vehicle, they continued to argue. As they left Troy's house, Higginson texted her stepdaughter, "dickhead is bringing me home." (Exh. Vol. II, p. 75). The specifics of what occurred in the vehicle remain unclear, as Higginson offered various versions; however, what is clear is that she fatally shot Troy in the chest with her gun.

[9] At approximately 9:31 p.m., Higginson contacted 911 and reported that she had shot Troy. Before making the call, Higginson consumed "25 Seroquel pills" in an attempt to alleviate her anxiety before the police arrived. (Appellant's App. Vol. II, p. 60). Soon after, Deputy Bryan Hicks (Deputy Hicks) of the PCSD arrived at 1200 Wade Road, which was not too far from Troy's home, to investigate the incident. Deputy Hicks identified a black BMW, which he confirmed belonged to Troy, and found Higginson seated on the side of the road, while Troy was found unresponsive in the driver's seat of the vehicle. Troy died at the scene from a gunshot wound in the upper chest area. After detaining Higginson and placing her in the police vehicle, Higginson explained that her firearm was on the passenger side floorboard. When Deputy Hicks attempted to question[2] Higginson about the shooting, Higginson appeared to be under the influence of "narcotics given her manner of speech", and she did not offer any information at that point. (Appellant's App. Vol. II, p. 60). Higginson was transported to the hospital for an evaluation, and Deputy Melliff accompanied Higginson in the ambulance. Although Deputy Melliff did not observe any injuries on Higginson from the prior evening when he responded to the domestic disturbance, he observed bruising on Higginson's arms and thigh.

[10] Four days after the shooting, Deputy Fortune advised Higginson of her *Miranda* rights during his visit to the hospital. Higginson stated that Troy was pulling

---

[2] There is no indication in the record as to whether Higginson had received her *Miranda* warnings at this point, but she did not make any self-incriminating statements when questioned.

her hair while they were driving on Wade Road, and she responded by retrieving her .357 caliber revolver from her purse and placing it on top of the purse. Higginson reported that when she asked Troy to stop pulling her hair, he refused and asked, "what are you going to do about it?" (Appellant's App. Vol. II, p. 65). In response, Higginson shot Troy in the chest.

[11] After being discharged from the hospital, Higginson had a second interview with Deputy Fortune, during which she was reminded of her *Miranda* rights. During this conversation, Higginson stated that she asked Troy to stop pulling her hair while driving on Wade Road, but he refused, called her a "bitch," and pushed her head toward the floorboard, knowing that would upset her. (Appellant's App. Vol. II, p. 65). Higginson added that she retrieved her revolver from her purse and shot Troy before he could react. She also disclosed to Deputy Fortune that she and Troy had experienced fewer than five physical altercations but concealed them from the public to protect their car racing business. However, Deputy Fortune confronted Higginson with a Facebook post showing her injuries and another post written one hour before the shooting in which she suggested that Troy needed "some good old-fashioned ass whooping to knock some of the air out of his swollen ego[-]filled head." (Appellant's App. Vol. II, p. 66).

[12] On June 25, 2018, the State filed an Information, charging Higginson with murder, a felony. The State later filed its notice of intent to seek a sentencing enhancement for Higginson's use of a firearm while committing the offense. On October 3, 2018, Higginson filed a notice of intent to raise a claim of self-

defense under Indiana Code section 35-41-3-11(b)(2) (effects-of-battery-statute) through Dr. Polly Westcott's (Dr. Westcott) testimony. The trial court granted the State's motion to exclude Dr. Westcott's testimony and Higginson moved to certify the trial court's order for an interlocutory appeal. We accepted jurisdiction and conducted an oral argument. We, however, reversed the trial court's order and determined that on remand, "Dr. Westcott may testify as to the objective component of a person's reasonable belief that they were under threat of imminent harm, given their PTSD, but not [to Higginson's] specific subjective belief" that her PTSD, which resulted from domestic violence, led her to use justifiable force. *See Higginson v. State*, 183 N.E.3d 340, 346 (Ind. Ct. App. 2022).

[13] On August 23, 2022, Higginson entered into a plea agreement with the State in which she agreed to plead guilty to Level 2 felony voluntary manslaughter, and the State dismissed the murder and firearm sentence enhancement charges. Sentencing was left open to the trial court. A guilty plea hearing was conducted on the same day, and the trial court accepted Higginson's plea. The trial court then directed the preparation of a presentencing report (PSI) ahead of the sentencing hearing.

[14] The PSI established that, along with the current charge, Higginson's criminal history includes a Class A misdemeanor battery charge committed in 2013 but was dismissed in 2014 after her successful completion of a pretrial diversion program. In her account of the events leading up to Troy's death, Higginson provided additional statements that she had not previously disclosed.

Specifically, she informed the probation department that on the day she shot and killed Troy, she had engaged in a physical altercation with him earlier. She explained that Troy grabbed her hand and repeatedly slammed it on the nightstand to obtain her key. Higginson also reported that when she argued with Troy inside the BMW, she feared that he would take her gun and use it against her since he was a skilled shooter. She explained that she accidentally fired the weapon while holding it with her non-dominant hand. Furthermore, Higginson claimed that the protective orders and ongoing divorce proceedings initiated by Troy were part of his manipulative tactics to portray her as the abuser. Ultimately, the probation department noted that Higginson's version of events during the interview significantly differed from what she had once told law enforcement.

[15] During the sentencing hearing on October 6, 2022, Dr. Westcott testified that based on her evaluation, she diagnosed Higginson with Post-Traumatic Stress Disorder (PTSD). Although Higginson had experienced a number of traumatic events throughout her life, including a molestation incident when she was five years old, as well as physical, sexual, and verbal abuse during her previous marriage, which had lasted for ten years, Dr. Westcott concluded that none of those events directly contributed to her present PTSD symptoms. Instead, Higginson's PTSD symptoms arose "as a result of her marriage to Troy." (Tr. Vol. II, p. 26). Dr. Westcott explained that people diagnosed with PTSD are susceptible to extreme reactions, including the use of deadly force, to seemingly minor triggers that mimic past abuse.

[16] Higginson then made a statement in allocution in which she expressed remorse and requested forgiveness from Troy's family. However, most of her statement focused on the extensive physical and emotional abuse she had endured at the hands of Troy. Higginson explained that Troy had been the main perpetrator of domestic violence and a skilled manipulator who played the victim while physically and emotionally abusing her. She also criticized Troy's family and society for failing to recognize the warning signs of domestic violence. Finally, Higginson urged the trial court to recognize her as a victim and to treat her with the same level of empathy and understanding as it would for Troy.

[17] Ahead of the sentencing hearing, each party submitted a memorandum on sentencing. Higginson's memorandum focused on presenting at least ten mitigating factors, while the State's memorandum focused on the aggravating factors. The State's memorandum also included several exhibits, including Dr. Gregory Hale's (Dr. Hale) evaluation of Dr. Westcott's assessment of Higginson's PTSD diagnosis. Dr. Hale's report exposed weaknesses in Dr. Westcott's assessment of Higginson. While he agreed with Dr. Westcott's diagnosis of PTSD, he raised some concerns about the evaluation process. Specifically, Dr. Hale pointed out that Dr. Westcott's report failed to mention the mutually combative relationship between Troy and Higginson during their marriage. He also criticized the report for relying too heavily on self-reported information provided by Higginson when making the diagnosis. Dr. Hale's report further stated, in part, that:

The PTSD diagnosis does not explain Ms. Higginson's actions nor is it an explanation for killing [Troy]. Individuals with PTSD are more a danger to themselves than others. Discomfort with their symptoms is usually something they want to avoid and is used as justification for suicide. Also, there is no discussion regarding other causal factors for the psychological condition identified by Ms. Higginson's actions. Ms. Higginson has had exposure to multiple trauma events in her lifetime. Any of these events could be a casual factor for the symptoms attributed to PTSD. It is unreasonable to assume [Troy's] violent behavior in the relationship with Ms. Higginson is the factor causing PTSD. That is not to say that the PTSD diagnosis is inaccurate, but that is not an explanation for Ms. Higginson shooting her husband.

I am concerned the context of this event is not being properly explored. That is, Mr. Higginson was shot one week prior to the dissolution of their marriage. A postnuptial agreement was filed on May 30, 2018, and signed by Ms. Higginson. Obviously, her life circumstances were going to change significantly once divorced. Thus, the reason for the June 2018 deadly encounter might not be related to a history of interpersonal violence but, rather, to external factors connected to the current circumstance.

Finally, another issue not addressed thus far is why Ms. Higginson would kill her soon to be ex-husband. In evaluating women involved in violent relationships, a critical precursor to killing the violent partner is a belief that the victim is in imminent danger. As I understand the sequence of events at the time of the shooting [Troy] was driving Ms. Higginson to his daughter's home. Ms. Higginson had previously stayed with [her] [step]daughter the night before when law enforcement drove her from their [marital] home to his [step]daughter's home. As told by Ms. Higginson, they were once again engaged in behavior common for them. Interesting to me, given her concern about Mr. Higginson behavior, Ms. Higginson went back to their house the next day to "do laundry." It is highly unusual for a woman

who believes she is in imminent danger to return to a dangerous situation and risk an encounter with her abuser. This choice is contrary to the behavior of a woman experiencing the effect of [battered woman syndrome] and believes she is in imminent danger.

(Appellant's App. Vol. II, pp. 184-85).

[18]     After reviewing the evidence and arguments presented, the trial court analyzed all thirteen mitigating circumstances outlined in Indiana Code section 35-38-1-7.1. First, the trial court declined to find that the crime did not cause or threaten serious harm to persons or property, as Troy died due to Higginson's actions. Secondly, the trial court rejected the argument that the crime resulted from circumstances unlikely to recur, as it could not be sure that Higginson would not react violently in the future given her criminal history and PTSD diagnosis. The trial court also evaluated whether Troy had induced or facilitated the offense and concluded that Higginson had caused it by putting herself back in a highly charged environment after being safely removed. The text messages between Higginson and Troy further supported this finding, as they showed that Higginson instigated the altercation while Troy attempted to diffuse the situation by asking her to leave peacefully. The trial court then considered whether there were substantial grounds to excuse or justify the crime and whether Higginson acted under strong provocation, and it found that Higginson's inconsistencies with law enforcement made it difficult to believe her version of events or that her PTSD caused her to react as she did. Regarding Higginson's criminal history, the trial court rejected the argument

that she had no history of delinquent or criminal activity and instead found that she had a history of criminal conduct involving Troy as the victim. The trial court also declined to find that Higginson would respond affirmatively to probation or short-term imprisonment, nor that her character and attitude indicated she was unlikely to commit another crime. The trial court reasoned that it could not definitively say that Higginson would not commit a similar crime in the future. Additionally, the trial court rejected the argument that a period of incarceration would pose an undue hardship on Higginson's dependents, stating that imprisonment inevitably involved some form of hardship. The trial court then evaluated Higginson's PTSD diagnosis, and it ultimately found that the evidence presented did not support a conclusion that Higginson's PTSD caused her to respond with deadly force to Troy's alleged words, actions, or behaviors. Finally, the trial court considered whether to give mitigating weight to Higginson's plea agreement. The trial court determined that Higginson had derived a substantial benefit from pleading guilty because the State had agreed to dismiss the firearm sentence enhancement and allowed her to plead to voluntary manslaughter, a lesser-included offense of murder.

[19] As for aggravating factors, the trial court found that the victim suffered significant harm as he lost his life, Higginson's criminal history, which included the dismissed misdemeanor battery charge, the protective order that Troy had obtained against Higginson, Higginson's prior threats against Troy, and her dishonest character depicted through the conflicting reports she provided to the police and the probation department. After considering all the factors, the trial

court determined that the aggravating factors outweighed the mitigating factors. The trial court found that a maximum sentence was appropriate and ordered Higginson to serve thirty years in the Department of Correction.

Higginson now appeals. Additional information will be provided as necessary.

# DISCUSSION AND DECISION

Higginson asserts that her thirty-year sentence for her voluntary manslaughter conviction is inappropriate in light of the nature of the offense and her character. Although Higginson claims to challenge the appropriateness of her sentence and her standard of review is limited on this basis, her argument on appeal is entirely focused on whether the trial court abused its discretion at sentencing. "As our Supreme Court has made clear, inappropriate sentence and abuse of discretion claims are to be analyzed separately." *King v. State*, 894 N.E.2d 265, 267 (Ind. Ct. App. 2008) (citing *Anglemyer v. State*, 868 N.E.2d 482, 491 (Ind. 2007), *clarified on reh'g*, 875 N.E.2d 218 (Ind. 2007)). Therefore, if a defendant fails to develop an independent discussion to support an inappropriate sentence claim, the defendant waives the issue for review. *See Allen v. State*, 875 N.E.2d 783, 788 n. 8 (Ind. Ct. App. 2007). Waiver notwithstanding, we will address the independent sentencing arguments separately.

## I. *Abuse of Sentencing Discretion*

Sentencing decisions "rest within the sound discretion of the trial court and are reviewed on appeal only for an abuse of discretion." *Anglemyer*, 868 N.E.2d

490. An abuse of discretion occurs if the decision is clearly against the logic and effect of the facts and circumstances before the court, or the reasonable, probable, and actual deductions to be drawn therefrom. *Id*. When imposing a sentence for a felony, a trial court must enter a sentencing statement including reasonably detailed reasons for imposing a particular sentence. *Id*. at 491. A trial court abuses its discretion when it fails to issue a sentencing statement, gives reasons for imposing a sentence that are not supported by the record, omits reasons clearly supported by the record and advanced for consideration, or considers reasons that are improper as a matter of law. *Id*. at 490-91. Because the trial court no longer has any obligation to weigh aggravating and mitigating factors against each other when imposing a sentence, a trial court cannot now be said to have abused its discretion in failing to properly weigh such factors. *Id*.

A. *Aggravating Factors*

[23]     Higginson contends that the trial court abused its discretion in crafting her sentence by: (1) using an element of the charged offense as an aggravating factor; (2) considering the facts surrounding the commission of the crime as an aggravating factor; (3) improperly considering her criminal history based on a dismissed charge; and (3) allocating too much weight to a certain aggravator.[3]

---

[3] Higginson argues that the trial court afforded too much weight in her attempt to conceal information regarding the shooting incident, we, however, need not address these argument as it was a proper aggravator, and it is not a cognizable claim on appeal. *See Kingery v. State*, 659 N.E.2d 490, 498 (Ind. 1995) (holding that

### i. *Element of the Charged Offense*

[24] Higginson argues that the trial court improperly relied on an element of her charged offense as an aggravating factor. As noted, Higginson pleaded guilty to Level 2 felony voluntary manslaughter. Indiana Code section 35-42-1-1(1) provides that a person who knowingly or intentionally kills another human being commits murder. However, a person who knowingly or intentionally kills another human being while acting under "sudden heat" commits voluntary manslaughter. I.C. § 35-42-1-3(a). While "a trial court may not use a material element of the offense as an aggravating circumstance, it may find the nature and circumstances of the offense to be an aggravating circumstance." *Plummer v. State*, 851 N.E.2d 387, 391 (Ind. Ct. App. 2006); *See also* Ind. Code § 35-38-1-7.1(a)(1) (permitting the trial court to consider the harm, injury or damage suffered by the victim as an aggravating factor where it is significant and greater than the elements of the offense). "[T]o enhance a sentence using the nature and circumstances of the crime, the trial court must detail why the defendant deserves an enhanced sentence under the particular circumstances." *Plummer*, 851 N.E.2d at 391. This aggravator is thought to be associated with particularly heinous facts or situations. *See Vasquez v. State*, 762 N.E.2d 92, 97 (Ind. 2001).

---

a trial court may consider a defendant's effort to interfere in the investigation of a crime by concealing information to be an aggravating circumstance). To the extent it is not a cognizable claim on appeal, as noted, a trial court cannot now be said to have abused its discretion by failing to properly weigh aggravating and mitigating factors. *Anglemyer*, 868 N.E .2d at 491.

[25] After the sentencing court reiterated the provision of Indiana Code section 35-38-1-7.1(a)(1), its preceding statement was, "as I indicated earlier, obviously [][Troy] lost his life in this matter. Uh, I don't know what damage or loss could be suffered by a victim in a particular matter greater than the loss of life. . . ." (Tr. Vol. II, p. 145). We agree with Higginson that the trial court's statement, reiterating an essential element of the offense (*i.e.*, the loss of life), cannot be used as an aggravator to enhance Higginson's sentence unless the trial court provides additional clarification regarding how Higginson's participation in the crime surpasses the scope of the offense's elements.

[26] Nevertheless, we need not remand for resentencing, as here, if we can say with confidence that the trial court would have imposed the same sentence if it had considered proper aggravating and mitigating circumstances. *McCain v. State*, 148 N.E.3d 977, 984 (Ind. 2020). As we will continue to discuss below, there were other valid aggravating factors upon which the trial court relied on imposing Higginson's sentence. Thus, we are certain that the trial court would have rendered the same sentence irrespective of this aggravator.

ii. *Circumstances Surrounding the Crime*

[27] Next, Higginson argues that the trial court improperly considered the circumstances surrounding the crime, *i.e.*, the 24 hours leading up to the commission of the crime. The State responds by arguing that the trial court was permitted to consider the 24 hours prior to the commission of the crime "because it goes to the nature and circumstances of the crime and belies Higginson's account that Troy initiated the violence against her and that she

was an innocent victim of violence who was pushed to respond with deadly force." (Appellees' Br. p. 23).

[28] "'Generally, the nature and circumstances of a crime is a proper aggravating circumstance.'" *Hudson v. State*, 135 N.E.3d 973, 980 (Ind. Ct. App. 2019) (quoting *Gomillia v. State*, 13 N.E.3d 846, 853 (Ind. 2014)). "[T]o enhance a sentence using the nature and circumstances of the crime, the trial court must detail why the defendant deserves an enhanced sentence under the particular circumstances." *Plummer*, 851 N.E.2d at 391.

[29] As noted, despite having a safe place to stay following the previous night's domestic complaint episode, Higginson returned to Troy's residence the next day and argued with Troy. In an attempt to further aggravate Troy, she sent him text messages threatening to find new partners and confessed to cheating on him while they were married. Troy's response was kind and considerate and he requested her to peacefully leave. When Troy refused to give Higginson the keys to his motorcycle and offered to drive her, another argument ensued, but Higginson agreed to leave. Higginson then shot Troy on the drive home. The trial court noted in its sentencing statement that Higginson gave at least three varying accounts of how she retrieved her firearm and shot Troy, and while not entirely discounting her PTSD diagnosis as the reason for her violent reaction, the trial court found that Higginson put herself in a "very volatile situation, after having been removed from it" the night before. (Tr. Vol. II, p. 148). Here, we find no error in the trial court's consideration of the circumstances surrounding the commission of the offense as an aggravating factor. *See Ousley*

*v. State*, 807 N.E.2d 758, 760, 765 (Ind. Ct. App. 2004) (recognizing that the trial court may consider the nature and circumstances of a crime when sentencing a defendant).

iii. *Criminal History*

[30] Higginson's criminal history is limited to one misdemeanor charge for the domestic battery that was disposed of through a pre-trial diversion program in 2014. Higginson challenges the trial court's use of that dismissed charge as an aggravating factor. Our supreme court has stated:

> Charges that do not result in convictions may be considered by the sentencing court in context, but something more than mere recitation unaccompanied by specific allegations should be shown. We have held that "[i]n order to enhance a criminal sentence based, in whole or in part, on the defendant's history of criminal activity, a sentencing court must find instances of specific criminal conduct shown by probative evidence to be attributable to the defendant. A bare record of arrest will not suffice to meet this standard."

*McElroy v. State*, 865 N.E.2d 584, 591 (Ind. 2007) (quoting *Tunstill v. State*, 568 N.E.2d 539, 544 (Ind. 1991). Despite Higginson's successful completion of the pre-trial diversion program in 2014, which included her participation in an anger management program and ultimately leading to the dismissal of the domestic battery charge, Higginson continued to engage in acts of violence and aggression. In identifying Higginson's dismissed charge as an aggravating factor, the trial court noted that Higginson's dismissed charge was not a conviction but was a "history of behavior" toward Troy and considered the

behavior to be "significant" as she was the "aggressor" in that past domestic incident and had not been deterred from engaging in further "anti-social behavior." (Tr. Vol. II, p. 145). In the given context, the trial court properly determined Higginson's record of arrest for battery to be significant because Higginson has not been deterred from engaging in additional domestic violent episodes despite her arrest. *See Belcher v. State*, 138 N.E.3d 318, 328 (Ind. Ct. App. 2019) (where trial court at sentencing considered the fact that Belcher had been given prior opportunities to rehabilitate himself through anger management and domestic violence classes, but Belcher had continued to commit battery offenses)*, trans. denied.*

[31] As a final note, Higginson relies on *Douglas v. State*, 878 N.E.2d 873, 877 (Ind. Ct. App. 2007) in support of her argument that her dismissed offense, which occurred approximately four years before the current offense, should not have been considered as an aggravating factor because of its lack of "gravity and proximity" to the instant offense. (Appellant's Br. p. 10). In *Douglas*, we reversed Douglas' thirty-month sentence because his criminal history consisted of convictions that were over ten years old, and the remaining traffic infractions were not similar in nature to his offense, *i.e.*, Douglas' failure to register as a sex offender. *Douglas*, 878 N.E.2d at 877. We find *Douglas* inapplicable to Higginson's case because her past arrest for domestic battery involved violent acts against Troy, the same victim in the current offense. Therefore, we conclude that Higginson's dismissed charge, while only appearing as a record of arrest, was relevant, and a proper aggravating factor.

## B. *Mitigating Factors*

[32] When a defendant claims a trial court abused its discretion by failing to find a mitigating circumstance, the defendant must establish the claimed mitigator is both significant and clearly supported by the record. *Anglemyer*, 868 N.E.2d at 493. Although a failure to find mitigating circumstances clearly supported by the record may imply that the trial court improperly overlooked them, the trial court "is not obligated to explain why it has chosen not to find mitigating circumstances. Likewise, the court is not obligated to accept the defendant's argument as to what constitutes a mitigating factor." *Id.* Higginson argues that the trial court abused its discretion in failing to consider the following mitigating factors, namely, (1) that the crime was the result of circumstances likely to recur; (2) that the crime was induced or facilitated due to her PTSD diagnosis; and (3) that there are substantial grounds tending to excuse or justify the crime due to her PTSD diagnosis.

[33] Turning to Higginson's first contention, that the circumstances that led to the crime are unlikely to recur since Troy is "regrettably deceased" and "[t]here is no evidence of [her] bad behavior toward other persons" other than Troy, this is an argument that the trial court expressly rejected. (Appellant's Br. p. 12). For this proffered mitigator, the trial court determined that it could not "necessarily say what would or would not happen" in the future, given Higginson's PTSD diagnosis. (Tr. Vol. II, p. 141). Stated differently, the trial court gave limited mitigating weight to this factor since it could not be certain that Higginson would not react violently in the same way in case of another incident.

[34] As for mitigating factors two and three, which we understand as claims that the trial court failed to consider her PTSD diagnosis as it related to those factors, our supreme court has held that "mental illness at the time of the crime may be considered a significant mitigating factor." *Castor v. State*, 754 N.E.2d 506, 509 (Ind. 2001). With that said, our supreme court has emphasized that evaluating the validity of a claim that mental illness deserves mitigating weight requires the exercise of "a high level of discernment." *Covington v. State*, 842 N.E.2d 345, 349 (Ind. 2006). The following considerations are relevant when the trial court determines the significance of a defendant's mental illness for sentencing: (1) the extent of the defendant's inability to control his or her behavior due to the disorder or impairment; (2) overall limitations on functioning; (3) the duration of the mental illness; and (4) the extent of any nexus between the disorder or impairment and the commission of the crime. *Id.*

[35] Dr. Westcott's testimony was that a victim of domestic abuse might enter into "fight or flight mode" based on a triggering event, and it was not "uncommon" for such a victim to use deadly force "to try to survive" the abuse. (Tr. Vol. II, p. 19). According to Dr. Westcott, the domestic abuse Higginson experienced during her eight years of marriage to Troy led to her PTSD symptoms, and she suggested that incidents that resemble past domestic abuse may prompt a victim who suffers from such trauma to resort to the use of deadly force. While the trial court expressed its overall concern with Dr. Westcott's reliance on using "subjective information" solely provided by Higginson to diagnose her with PTSD, it nevertheless accepted that diagnosis. (Tr. Vol. II, p. 148).

[36] Based on our review of the record, we find that, notwithstanding the trial court's acceptance of Higginson's PTSD resulting from the domestic abuse she endured during her lengthy marriage to Troy, other evidence strongly suggests that Higginson deliberately engaged in violent behavior, demonstrating the ability to control her actions without limitation. As noted, the trial court had the opportunity to review Dr. Hale's report, which provided that Higginson's behavior of returning to a home where she had endured abuse after having been removed from it the day before was inconsistent with a person who has PTSD. As the trial court pointed out, notwithstanding her PTSD diagnosis and her claim that Troy had consistently engaged in domestic violence against her for the past eight years, it could not "objectively" understand why Higginson chose to return to Troy's house the next day and put herself in "a very volatile situation". (Tr. Vol. II, p. 148). Based on the trial court's statement, it is clear that it considered Higginson's PTSD diagnosis at sentencing. Despite the possible connection between her PTSD and the crime, we conclude that Higginson had the capacity to control her behavior, without limitation, at the time of the offense. Therefore, as in *Covington*, we are not persuaded that the trial court "erred in assigning some, but not determinate, weight" to Higginson's PTSD diagnosis. *Covington*, 842 N.E.2d at 349.

II. *Appropriateness of Sentence*

[37] Higginson claims that her thirty-year sentence is inappropriate in light of the nature of the offense and her character. Although a trial court may have acted within its lawful discretion in imposing a sentence, Indiana Appellate Rule 7(B)

provides that an appellate court "may revise a sentence authorized by statute if, after due consideration of the trial court's decision, the court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender."  The primary role of Rule 7(B) review "should be to attempt to leaven the outliers, and identify some guiding principles for trial courts and those charged with improvement of the sentencing statutes, but not to achieve a perceived 'correct' result in each case."  *Cardwell v. State*, 895 N.E.2d 1219, 1225 (Ind. 2008).

[38]    Whether we regard a sentence as appropriate at the end of the day turns on our sense of the culpability of the defendant, the severity of the crime, the damage done to others, and a myriad of other considerations that come to light in a given case.  *Suprenant v. State*, 925 N.E.2d 1280, 1284 (Ind. Ct. App. 2010), *trans. denied*.  An appellant bears the burden of persuading this court that his sentence is inappropriate.  *Corbally v. State*, 5 N.E.3d 463, 471 (Ind. Ct. App. 2014).

[39]    The sentencing range for a Level 2 felony is between ten and thirty years, with the advisory being seventeen and one-half years.  Ind. Code § 35-50-2-4.5.  The trial court sentenced Higginson to the maximum sentence of thirty years. When reviewing the nature of the offense, we look at the details and circumstances of the offense and the defendant's participation therein.  *Madden v. State*, 162 N.E.3d 549, 564 (Ind. Ct. App. 2021).  Higginson shot and killed Troy while being offered a ride home.

[40] Finally, we turn to the character of the offender. It is well settled that, when considering the character of the offender, one relevant fact is the defendant's criminal history. *Johnson v. State*, 986 N.E.2d 852, 857 (Ind. Ct. App. 2013). Higginson's sole criminal charge was dismissed in 2014 due to a pretrial diversion agreement. However, it as a record of arrest, and it reflects poorly on her character. *See Zavala v. State*, 138 N.E.3d 291, 301 (Ind. Ct. App. 2019) ("A record of arrests reflects on the defendant's character in part because such record reveals that subsequent antisocial behavior by the defendant has not been deterred even having been subject to police authority and having been made aware of its oversight."), *trans. denied*. Higginson's character is further diminished by the fact that an hour before she shot Troy, she issued a threat to him on Facebook, stating that he needed a "good old-fashioned ass whooping to knock some of the air out of his swollen ego[-]filled head." (Appellant's App. Vol. II, p. 66). Although the trial court indicated that such threats would typically be ignored, in Higginson's case, her "threats came to life." (Tr. Vol. II, p. 143); *See McCain v. State*, 148 N.E.3d 977, 985 (Ind. 2020) (holding that a defendant's "Facebook posts showing a desire for violent conflict" reflected poorly on his character). Finally, even though Higginson pleaded guilty to voluntary manslaughter, a lesser included offense to murder, she blamed Troy for her actions, and she provided multiple inconsistent accounts of how she shot Troy to various parties, including the police, Dr. Westcott, the probation department, and also in her allocution statement. By doing so, she attempted to shift the blame away from herself and undermine her own responsibility for the crime, which reflects poorly on her character. *See Boling v. State*, 982 N.E.2d

1055 1061-62 (Ind. Ct. App. 2013) (defendant placing blame on victim showed poor character and allowed for aggravated sentence).

[41] In sum, Higginson has failed to meet her burden of persuading us that her overall thirty-year sentence, which we do not find to be an outlier, is inappropriate in light of her character and the nature of her offense. *See e.g., Eversole v. State*, 873 N.E.2d 1111, 1113-14 (Ind. Ct. App. 2007) (upholding a thirty-year sentence for voluntary manslaughter, without a firearm enhancement, as appropriate under 7(B) even though defendant, who killed his wife's lover with a single gunshot, had no criminal record and possessed "good character"), *trans. denied*.

## CONCLUSION

[42] For the foregoing, we conclude that the trial court did not abuse its discretion in sentencing Higginson, and the sentence is not inappropriate in light of the nature of Higginson's offense and her character.

[43] Affirmed

[44] Altice, C. J. and Pyle, J. concur